# THE ANGLO-AMERICAN SAVINGS & LOAN ASSOCIATION

*v.*

# CAMPBELL.

MECHANICS' LIENS; PRIORITIES; CONTRACTS; EQUITY; CONSTRUC-
   TIVE TRUSTS; EQUITABLE ESTOPPEL.

1. A recorded deed of trust to secure a building loan, which under a
   separate contract between lender and borrower is to be ad-
   vanced by the lender to the borrower in instalments as the
   building progresses to completion, has priority over all me-
   chanics' liens for labor and materials supplied under subse-
   quent contracts.
2. A purchase-money deed of trust and a deed of trust to secure a
   building loan made to improve the property purchased, are
   not subordinated to mechanics' liens for labor and materials
   subsequently furnished, by an arrangement between the ven-
   dor, the lender and the borrower contemplating the purchase of
   the property and the joint construction of buildings thereon.
3. Where under a contract for a building loan to be secured by deed
   of trust, it is not obligatory upon the lender to see that the
   money advanced is applied to payments for labor and mate-
   rials furnished in the construction, payments on account of the
   loan made by the lender to the borrower after, as well as be-
   fore, notice of mechanics' liens, are in discharge of the con-
   tract of the lender and brings the lender under no liability to
   the lienors.
4. But where a building owner who has paid but one-third of the
   purchase price of the property to be built upon, borrows
   $46,500 from a building association for the purpose of building,
   the loan to be advanced in instalments at different stages of
   the construction, and the buildings are erected at that cost,
   but the association, for its own advantage and without justi-
   fication, retains $3,000 of the loan, although under the circum-
   stances it is charged with knowledge that the persons
   furnishing labor and materials did so upon the faith of
   the advance to the borrower of the full amount of the loan,
   equity will, upon the principle of equitable estoppel, enforce a
   constructive trust upon the fund of $3,000 retained by the asso-
   ciation in favor of the persons so furnishing the labor and
   materials.
5. One who purchases property at a deed of trust sale made pending
   a suit to enforce mechanics' liens against the property and

who thereafter files the undertaking required by the mechanics' lien law and secures the release of the liens, is bound as owner, although not technically a party defendant to the suit.

6. Where such a suit fails to establish the mechanics' liens sought to be enforced, but a constructive trust upon a fund in the hands of one of the defendants is declared in favor of the lienors, the obligation of the undertaking ceases and the principal and his sureties are discharged.

No. 790.  Submitted November 16, 1898.  Decided December 13, 1898.

HEARING on an appeal by the defendants from a decree in a suit to enforce mechanics' liens.  *Modified and affirmed.*

The COURT in its opinion stated the case as follows:

This suit to enforce a mechanics' lien was begun on February 19, 1897.  The bill was filed by William D. Campbell for himself and on behalf of all others having like demands against David M. Lea, the debtor and owner of the legal title to the premises, and the Anglo-American Savings and Loan Association, a corporation of New York, and other incumbrancers, together with the trustees in the conveyances securing the several incumbrances.

Leave having been granted for the purpose, Allen S. Johnson, The Julius Lansburgh Furniture and Carpet Company, and Landon & Merriam intervened by petition, respectively, setting up demands for labor and materials furnished David M. Lea in the construction of certain houses on the lots described in the bill; and joining in the prayers of said bill.

The aggregate amount of the indebtedness sought to be recovered in the bill and petitions of intervention is $3,253.40 with interest, and notices of liens have been duly registered by the parties, respectively, in the manner required by law.

There is no question in respect of the amount of each demand and the validity of the lien therefor as against David M. Lea.

There is little or no conflict in the evidence, and the material facts shown in the record may be stated substantially as follows:

On and before March 27, 1896, David M. Lea was the owner of the premises—then vacant lots—at the corner of R and Seventeenth streets, northwest, in the city of Washington. These, when conveyed to him, were subject to a vendor's lien secured by a deed of trust for about $10,300. He became indebted to his grantors for part of the purchase-money, amounting to $6,157, for which he executed notes, as follows: one for $1,500, payable one month after date; another for $2,500, payable two months after date; and a third for $2,157, payable three months after date. All bore date as of March 28, 1896, and were secured by a trust deed of the same date, that was recorded March 30, 1896.

The dates of these notes and trust deed were so arranged as to give precedence to the trust deed securing the Anglo-American Savings and Loan Association hereinafter mentioned.

Lea purchased the lots for the purpose of improving them and made a subdivision of them to accord with the plan for the erection of five substantial dwellings.

The Anglo-American Savings and Loan Association, of New York, is what is ordinarily called a building association, and is a corporation of that State. M. I. Weller, who resides in the District of Columbia, was the appraiser of property offered to the association as security for loans.

On March 2, 1896, David M. Lea addressed him a note saying: "I propose to spend $46,500 in the construction of five houses at the corner of Seventeenth and R Sts., N. W., for which purpose I make application to your association for a loan." This was followed on March 7, 1896, by a formal application, upon the blank form provided by the association for the purpose.

In this form the applicant was required to answer in detail questions propounded in respect of the locat on, condition and value of the lots, and to describe the contemplated buildings, as well as to furnish the plans and specifications therefor. He was also required to describe the property

owned by him, his indebtedness, and so forth. He stated that he had purchased the property in December, 1895, paying therefor $24,000, and declared that the buildings to be erected would cost $46,500, and would be insured for that amount for the benefit of the association.

The association agreed to make the loan of $46,500, which was to be secured upon the property and upon the four hundred and sixty-five shares of the stock of the association for which Lea subscribed in accordance with its rules.

He therefore executed a bond to the association, dated March 27, 1896, in the sum of $93,000, which recited the subscription to and delivery of the stock, and the loan of the said $46,500; and was conditioned upon the payment by the said Lea, monthly, of certain stipulated sums, as interest at the rate of five per cent. per annum, as premiums on the principal, and by way of monthly dues on the said stock. The said bond was secured by the conveyance of the premises to Stephen Van Wyck and F. L. Siddons, trustees, in the usual form, which was recorded March 28, 1896. The certificate for the four hundred and sixty-five shares of stock was returned to the association by Lea with a formal assignment thereof executed March 27, 1896. As additional security, Lea, with two sureties, Samuel Ross and Thomas H. Pickford, executed and delivered a bond to the association of the sum of $46,500. This recited the agreement for the loan, and, among other things, that:

" Whereas, it was a condition precedent to such loan or advance that said David M. Lea, together with a sufficient surety, should execute and deliver to said association a bond obligating said David M. Lea to complete and finish the construction and erection of the aforesaid improvements on or before the 27th day of August, A. D. 1896, and to protect said association from any loss or damage by reason of any lien or claim made against said land and improvements under the law commonly known as the 'mechanics' lien law;'"

The conditions were that they should indemnify the association against any loss and damage incurred by the failure of Lea to perform his agreements and should pay any and all sums by the said association or its successors, paid, laid out, expended or incurred, on account of, or by reason of, the failure, omission, neglect or refusal to fully erect, complete and finish the said building or buildings and the appurtenances on or before the 27th day of August, A. D. 1896, or on account of, by reason of, any lien or claim, or notice of any lien or claim, hereafter filed, within the period allowed by law, under the law commonly called the "mechanics' lien law," by any person or persons, firm or firms; body or bodies corporate, association or associations, against said land, or any part thereof, or against said building or buildings, or either of them, for or on account of any work or labor done or to be done, or for and on account of any materials, apparatus, implements, machinery, fixtures or ornaments, furnished or to be furnished, on, in, about, for the benefit of, or in relation to, said building or buildings, or either of them, from the commencement of said buildings to the full completion thereof, and which may be held to be paramount to the lien of the aforesaid mortgage, or any of them, or any part thereof, or prior or paramount to any of the advances made or to be made as aforesaid, then this obligation to be null and void; otherwise to be and remain in full force and virtue at law and in equity.

There was some arrangement, the particulars of which do not appear, by which Lea's grantors agreed to postpone the lien for the remainder of the purchase money to that in favor of the association; and in accordance therewith the dates of their notes and trust deed were given as before stated.

There was also a collateral agreement between Lea and the association, the details of which do not appear, relating to the times and amounts in which the $46,500 should be advanced, and controlling their disbursement. The allega-

tions of the bill in respect of the manner of the advancement, which the answers admit, are: One-third when the first-floor joists should be in all of the said houses; one-sixth when the roofs should be on all of them; one-sixth when all should be "white-coated"; one-sixth when the plumbing and carpenter work should be completed; and one-sixth when all the houses should be completed.

The first building contract was not made by Lea until March 31, 1896, and the work was commenced thereafter.

The first payment made by the association was $15,217.38 on April 28, 1896, through a check on itself, signed by its treasurer, and payable to David M. Lea or order. This was endorsed by Lea to Ralston & Siddons, who were the attorneys of the association in Washington. Other payments were made in the same way.

Mr. Siddons testified that the association first deducted the monthly dues of Lea to date, and sent the draft for the remainder of the instalment to be at the time advanced. Ralston & Siddons deposited the drafts received for collection and disbursed the money on account of Lea.

Out of the first payment they discharged the first mortgage on the lots, amounting to about $10,300, principal and interest.

Certain fees due M. I. Weller, the appraiser, and some other bills were paid for taxes and insurance. Some of the bills on account of building were paid at the request of the sureties on Lea's bond, and the remainder was paid to one of the sureties, Samuel Ross, in pursuance of a written order of Lea dated April 11, 1896. It was upon the written order of Ross that the first mortgage was paid off. Mr. Siddons also testified that he notified the sureties of the existence of claims that came to his knowledge from time to time and paid the same at their request; among these was the bill of a watchman employed by Weller.

The contractor-in-chief for the erection of the buildings

failed before completion, and the remainder of the work was done under the direction of the sureties on Lea's bond aforesaid. Some of the last money paid to the sureties, or on Lea's account, was after the filing of Campbell's lien and perhaps others.

The entire amount actually advanced by the association to Lea, or on his account, including his dues, deducted as aforesaid, was $43,500. The sum of $3,000 was deducted from the last draft by Lea's consent. He endorsed the last draft with that understanding and at the request of his sureties. He stated further that the association claimed that he had not come up to his plans, specifications and agreements with them; but that he and his sureties and the architect claimed that the building had been done according to the plans and specifications.

No evidence was introduced on the part of the association tending to show a failure to complete the buildings according to the plans and specifications submitted with the application for the loan. M. I. Weller, the appraiser for the association, testified that he supervised the construction of all buildings in the District under loans made by it, including the houses in question; and that they were completed on December 9, 1896, and so reported to the association.

There is also a stipulation, noted by the examiner taking the depositions, to the effect, "that the buildings were completed on or about December 9, 1896, formal proof of the date and facts of completion being waived."

It also appears from the evidence of Campbell, that when he notified Weller of his contract to furnish Lea with certain lumber and stairwork, Weller informed him that it would have to be good or he would not pass it.

Campbell testified that he knew of the trust deed to secure the association; that Lea told him of his arrangement to get the money for building; and that he would pay him for his material from that loan. He further testi-

fied that he entered into his contract on that representation, and that he learned from Mr. Siddons at what stages of the building the instalments were to be paid.

The contract between Lea and Campbell shows that the amount contracted for—$3,750—was to be paid as follows: $875 when the roofs are on all the houses; $1,000 when said houses are "white-coated"; and the remainder, $1,875, in four months from date.

The intervenors' contracts were made with R. M. Boyle, the general contractor with Lea, and they understood from Boyle that the money to pay for the work was to come from the loan of the association.

Pending the suit the premises in controversy appear to have been sold under the second mortgage to secure the purchase-money notes, and the legal title thereof conveyed to one Harvey T. Winfield.

Said Winfield, as owner, filed the statutory undertaking with sureties, binding himself to the claimants of the liens in case they should be established, and thereupon a decree was entered discharging the premises from the liens.

Upon the hearing a final decree was entered requiring the association to pay into the registry of the court, within thirty days, the sum of $3,000, with interest from December 9, 1896, for distribution among the complainant and intervenors. In default of such payment by the association, it was decreed that the said sum should be paid by the said Winfield and M. I. Weller and Thomas H. Pickford, sureties on the undertaking given to secure the payment of the liens on the premises; which had been discharged thereby.

*Messrs. Ralston & Siddons* and *Mr. Wm. F. Mattingly* for the appellant association:

1. If complainants have any right to proceed against the appellant association, it could only be after they had exhausted all remedies against Lea, the person primarily and, as we contend, exclusively liable to them on account of

their claims, and by showing that the money paid by the association on account of the loan was not sufficient to pay the bills incurred in constructing the buildings under the building contracts. Comp. St., Ch. 45, Sec. 1, 2d proviso; *Martin* v. *Campbell*, 6 Mackey, 296; Phillips on Mech. Liens, Sec. 225; *Davis* v. *Alvord*, 94 U. S. 545. There is not the slightest evidence of this character, but the court is left to inferences and assumptions on the subject. The complainants waited until the buildings were completed, and all the advances made by the association on account of the loan, and then for the first time and in their bill of complaint, make the claim that the association is a trustee for their benefit as to the amount of money that the mortgagor and mortgagee had between themselves agreed should not be advanced under the mortgage. Certainly there is no express trust made out in favor of the complainants, and there is no such relation between the appellant association and appellees as could give rise to any implied or constructive trust in the latter's favor, thereby entitling them to treat the money in question as trust funds for their benefit. Boisot on Mech. Liens, Sec. 322, 327; *Hadley* v. *Hill*, 73 Ind. 442; *Land Co.* v. *Leavensworth*, 60 N. W. R. 954; *Rogers* v. *Trust Co.*, 68 N. W. R. 1048; *Hill* v. *Aldrich*, 50 N. W. R. 1020; Boisot on Mech. Liens, Sec. 327 and cases cited. In *Moroney's Appeal*, 24 Pa. St. 373, it was held that a mortgagee is not bound to see that the money he lends is properly appropriated to pay builders and thus discharge their liens. In *Richardson* v. *Belt*, ante, p. 197, this court denied validity to an argument analogous to the one employed by the appellees, that sought to establish the kind of equitable lien claimed in the case at bar. See, also, *Thompson* v. *Railroad Co.*, 132 U. S. 68; *Railroad Co.* v. *Hamilton*, 134 U. S. 296.

2. If the foregoing disposes of the claim of the appellees, that, aside from their character as lienors, an equity arises in their favor, by virtue of their having furnished materials,

which in part created the security for appellant's mortgage, it may still be contended by them that as lienors under the mechanics' lien statute they are entitled to the relief afforded by the action of the lower court, for the reasons that the association was bound on the theory of constructive notice by the liens filed before all payments on account of the mortgage had been made by the appellant association, and certainly bound by such actual notice as it may have received of the existence of any of said liens, and it took the risk of having to pay again to these claimants, to the extent of their claims, any money that it may have advanced to Lea after the liens were filed. There are several answers to these contentions. The mechanics' lien statute in force in this District fixes the priority and extent of the lien that it gives to material-men and its other beneficiaries, and the court will not extend the statute to meet cases for which the statute itself does not provide, though they may be of equal merit with those provided for. 1 Jones on Liens, (2d Ed.), Sec. 105; *Copeland* v. *Kehoe,* 67 Ala. 594; *Rogers* v. *Currier,* 13 Gray, 129—our statute.

Appellees seek to enforce their claims against a fund arising from a mortgage admittedly prior in time and right to their own liens. The statute has given them no such remedy. It provides that every building erected or repaired by the owner or agent and the ground upon which such building is erected or repaired shall be subject to a lien in favor of material-men, etc., for a sum not to exceed the amount of the original contract for the erection or repair of such building, and in Section 4 it is provided that when a building shall be erected or repaired by a lessee or tenant for life or years, or a person having an equitable estate or interest in such building or the land on which it stands, the lien shall only extend to and cover the interest or estate of such lessee, tenant, or equitable owner. The remedy is against the property, and to the extent only of the interest of the building owner in said property (see, 2 Jones on

Liens, Sec. 1244), and no personal judgment can be rendered, except where, after a sale of the property in satisfaction of the lien, the proceeds of such sale are insufficient for the purpose, a judgment for the deficiency may then be rendered against the party who incurred the debt, if he be made or become a party to the suit, but not otherwise. *Emack* v. *Rushenberger*, 8 App. D. C. 254. Where, as in this case, the mortgage has been executed and recorded before the work of construction has been commenced or any materials furnished, it has been held that the mechanic or material-man furnishes the labor or material solely on the personal credit of the mortgagor and on his interest in the land, subject to the mortgage. 2 Jones on Liens, Sec. 1480, and cases cited.

3. The appellant association was not charged with constructive notice of the liens recorded subsequent to the recordation of its own mortgage, or deed of trust. Jones on Mortgages, Secs. 372, 562, and cases cited; *Truscott* v. *King*, 6 Barb. 349; *Mayer* v. *Hinman*, 13 N. Y. 191; *Ackerman* v. *Hunsicker*, 85 N. Y. 49; *Birnie* v. *Main*, 29 Ark. 591; *Ward* v. *Hague*, 25 N. J. Eq. 397; *Leach* v. *Beattie*, 33 Vt. 195; *Kyle* v. *Thompson*, 11 Ohio St. 616; *King* v. *McVicker*, 3 Sandf. Ch. 192; *Doolittle* v. *Cook*, 75 Ill. 354; *Heaton* v. *Prather*, 84 Ill. 320; *Taylor* v. *Maris*, 5 Rawle, 51. And the mere fact that the building was commenced after the mortgage was given, and that the mortagee knew this, is not sufficient to charge him with knowledge of the lien. Jones on Mortgages, Sec. 562; *Ward* v. *Hague*, 25 N. J. Eq. 397; *Cotton* v. *Holden*, 1 MacA. 463.

4. But it may be argued by the appellees that the mortgage or deed of trust in this case did not represent a loan already made, but to be made in the future in certain periodical instalments, and that as to such instalments made after the recordation of liens, the mortgagee becomes a subsequent creditor or mortgagee, and makes further advances subject to the recorded liens. It may be conceded

that the mortgage in this case is a mortgage for obligatory future advances, but it is settled law that such mortgages are valid. Jones on Mortgages, Sec. 365; Phillips on Liens, Sec. 236; *United States* v. *Hooe,* 3 Cranch, 73; *Shirras* v. *Caig,* 7 Cranch, 34; *Lawrence* v. *Tucker,* 23 Howard, 14; *Leeds* v. *Cameron,* 3 Sum. 488; *Bank* v. *Cunningham,* 24 Pick. 270; *Goddard* v. *Sawyer,* 9 Allen, 78; *Truscott* v. *King,* 6 N. Y. 147; *James* v. *Morey,* 2 Cow. 292; *Brinkerhoff* v. *Lansing,* 4 Johns. Ch. 73; *Fassett* v. *Smith,* 23 N. Y. 252; *Brackett* v. *Sears,* 15 Mich. 244; *Seaman* v. *Fleming,* 7 Rich. (S. C.), Eq. 283; *Garber* v. *Henry,* 6 Watts (Pa.), 57; *Robinson et al.* v. *Insurance Co.* 55 Md. 105.

5. It is not necessary that the mortgage should express on its face that it is given to secure future advances. (The case here.) It may be given for a specific sum, and it will then be security for a debt to that amount. Jones on Mortgages, Sec. 374; *Collins* v. *Carlile,* 13 Ill. 254; *Darst* v. *Gale,* 83 Ill. 136; *Bank* v. *Finch,* 3 Barb (N. Y.), Ch. 293; *Murray* v. *Barney,* 34 Barb. 336; *Craig* v. *Tappan,* 2 Sandf. Ch. 78; *Wescott* v. *Gunn,* 4 Duer, 107; *Walker* v. *Snediker,* Hoff. (N. Y.), Ch. 145; *Townsend* v. *Dressing Co.,* 6 Duer, 208; *Foster* v. *Reynolds,* 38 Mo. 553; *Griffin* v. *Oil Co.,* 11 N. J. Eq. 49.

6. But it may still be urged in behalf of the appellee Campbell that the appellant association, having actual notice of the recording of his lien, can not invoke the foregoing authorities to preserve its priority for advances made by it after such actual notice had been received. There are two answers to such a contention. First, advances covered by a mortgage have preference over the claims of junior incumbrances who have become such with notice of an agreement under the mortgage for the advances. Jones on Mortgages, Sec. 368, and cases cited in note 4; *Kramer* v. *Bank,* 15 Ohio, 253; *Truscott* v. *King,* 6 N. Y. 147; *Taylor* v. *LaBar,* 25 N. J. Eq. 222; *Platt* v. *Griffith,* 27 N. J. Eq. 207; *Mills Co.* v. *Schuda,* 72 Wis. 277. Campbell testified

to a knowledge of the contract between Lea and the association. Second, the mortgage or deed of trust in this case was for obligatory advances, and where this is the case it is well settled that actual notice of subsequent liens will not relieve the mortgagee of his obligation to the mortgagor to make such advances, and having made them, his position of priority of lien is preserved to him. Jones on Mortgages, Sec. 370; Boisot on Mech. Liens, Sec. 152; 15 Am. & Eng. Encyc. L. 799; *Lyle* v. *Duncomb,* 5 Binn. 585; *Moroney's Appeal,* 24 Pa. St. 372; *Wilson* v. *Russell,* 13 Md. 495; *Brooks* v. *Lester,* 36 Md. 65; *Crane* v. *Deming,* 7 Conn. 387; *Griffin* v. *Burtnett,* 4 Edw. Ch. 673; *Brinkmayer* v. *Browneller,* 55 Ind. 487; *Brinkmayer* v. *Helbling,* 57 Ind. 435; *Nelson* v. *Railroad Co.,* 8 Am. RR. R. 82; *Martsolf* v. *Barnwell,* 15 Kan. 612; *Taylor* v. *LaBar,* 25 N. J. Eq. 222; *MacIntosh* v. *Thurston,* 25 N. J. Eq. 242; *Platt* v. *Griffith,* 27 N. J. Eq. 207; *Iaege* v. *Bossieux,* 15 Gratt. 83; *Hill* v. *Aldrich,* 50 N. W. R. 1020; *Mills Co.* v. *Schuda,* 72 Wis. 272; *Richards* v. *Waldron,* 20 D. C. 585; *Frye* v. *Bank,* 11 Ill. 367; *Spader* v. *Lawler,* 17 Ohio, 371; *Ladue* v. *Detroit R.R.,* 13 Mich. 380.

From this review of the law and the evidence it seems clear that the appellees, as statutory lienors, can not maintain their claims as against the appellant association. It is equally clear that they have no standing as *cestuis que trustent,* claiming a fund alleged to be in the hands of the appellant association as trustee under an implied or constructive trust.

*Mr. A. S. Worthington* and *Mr. John C. Heald* for the appellant Pickford:

1. The undertakings were and are absolutely void. This is a strictly statutory proceeding and the court had no authority to approve any undertaking not specifically authorized by the statute. The act provides that "the defendant" may file a written undertaking, etc. The principal in these undertakings, Harvey T. Winfield, never was a

defendant in the cause, and the court had no authority to accept the bonds, in which he was principal. These being bonds taken in a judicial proceeding, not authorized by law, are void, and the principles relating to voluntary bonds can not be invoked to give them validity. *Charter Oak* v. *Hosmer*, 1 Mack. 297; *Prott Case*, 4 Mack. 259; *United States* v. *Draper*, 19 D. C. 85, 91, and cases referred to in the opinion.

2. The undertakings are to pay any decree that may be recovered to enforce the mechanics' lien. The bill in this cause was to enforce a claim against an alleged trust fund, and, in default of that, the statutory lien against the property. The deed of trust to secure the Savings and Loan Association having been recorded prior to the commencement of work on the buildings, was entitled to priority over all mechanics' liens, which were therefore practically worthless. This was evidently the view of the court below from its decree, which manifestly was that the $3,000 not advanced by the association was a trust fund and the parties to the undertakings are treated by the decree as the sureties for the association in respect of that fund, and not as liable for the payment of mechanics' liens.

3. If the $3,000 unadvanced by the association should be held not to be a trust fund, the decree against the association was erroneous and there was no legal default by it in not paying the amount decreed; no liability on the part of the other defendants, and the bill should be dismissed.

*Mr. Bates Warren* and *Mr. J. J. Darlington* for the appellees:

1. The appellant association can not, in equity and good conscience, be permitted to gain the security of the complainants' material and labor by its representations that it would advance a specified sum with which to construct the buildings, and then, when the materials and labor have been furnished upon the faith of those representations, withdraw that promise .and cut down the amount to be so

advanced, with or without the consent of the builder, retaining the benefit of the complainant's labor and materials so advanced upon the faith of that promise. It put its agreement with Lea to make these advances in writing, thus enabling him to offer that inducement to the complainant and others in like situation, and, in addition, through its attorney and disbursing agent, it confirmed those representations to him. The record shows that the complainant well knew of the incumbrances of record against the property, excluding the possibility of the security ordinarily afforded by mechanics' liens, and that he relied upon these representations as to the amount to be advanced. That this reliance was carefully and judiciously estimated, is shown by the fact that the amount retained by the association is just about sufficient to defray the unpaid bills for labor and materials furnished the work.

No case precisely in point can, perhaps, be found, for the reason that, in the numerous reported cases of contests for priority between intervening liens and mortgages for future advancements, the mortgagee has in every instance complied in good faith with his contract, and advanced the sum which he had agreed to do. The principle, however, is well-established. *Kinney* v. *Farnsworth*, 17 Conn. 355; *Hefner* v. *Vandolah*, 57 Ill. 523. Two cases which approach quite near to the principle involved, under facts like those of the present case, are *Land Co.* v. *Leavenworth*, 60 N. W. R. 954, and *Rogers* v. *Trust Co.*, 68 N. W. R. 1048, both of which are cited in the opposing brief. These cases in effect recognize and support the equity here relied upon, under the facts and pleadings as they exist in this case. See, also, *Taylor* v. *Ely*, 25 Conn. 250; *Crane* v. *Dunning*, 7 Conn. 388.

2. The result of the authorities cited by the appellants is that, if, under the contract between the mortgagor and the mortgagee, the future advances are obligatory, rendering it compulsory upon the part of the mortgagee to make them, he is unaffected by such liens; while if the advances are to be

voluntary, it being within his discretion to continue or dis-
continue them, the liens have priority over advances made
subsequently to notice of them.    But how does this state of
the law antagonize the decree of the court below?    If con-
tinuance of the advances was discretionary, these liens have
precedence over final payment or payments.    If, on the
contrary, they were not discretionary, but were compulsory
upon the part of the association, the decree below was simply
in accordance with its legal duty.    If obligatory, the asso-
ciation has $3,000 in its hands which is justly applicable
to payment of the. material-men, and therefore falls clearly
under the equitable principle declared and applied by this
court in *Emach* v. *Rushenburger*, 8 App. D. C. 254.    And see
*Keller* v. *Ashford*, 133 U. S. 610.

3. The third of the objections to the decree presented is
that urged on behalf of the appellant Pickford, to the effect
that the undertakings upon the faith of which the court
released the realty from the liens were void, because Win-
field was not a "defendant," in the sense of the statute pro-
viding for release of liens upon the filing of undertakings
with sureties in lieu thereof.

The objection rests upon an altogether too technical con-
struction of the term "defendant," as used in the act.    It
assumes that no release can be had by the owner of land
subject to the lien, unless or until some suit to enforce it,
in which suit the owner can be technically a "defendant,"
has been instituted.    This is not the meaning of the act.
The defendant referred to is, plainly, the owner, or person
against whom the lien is filed, or who is affected by it.    The
mere filing of the lien is a "proceeding under this act,"
in the sense of the statute; and the uniform practice has·
been to permit the owner to give the undertaking, and re-
lease his property accordingly.    This court has held that
the lien may be filed either against the party who was
owner at the time the contract was made, or against the

party who is owner at the time of lien filed. *Forsburg* v. *Lefler*, 1 App. D. C. 36. The owner is "defendant" within the meaning of this eleventh section of the act. It provides, in terms, for the approval of the undertaking before the filing of the bill to enforce the lien, and, consequently, before there can be any "defendant," in the strict technical sense of the term.

4. It is also objected, on behalf of the parties to the undertakings, that, in them, the latter undertake to pay any decree that may be recovered to enforce the mechanics' liens, while the bill in this case is to enforce a claim against a trust fund; and it is further urged that, the association's incumbrance having been recorded prior to the commencement of the work on the buildings, it was prior to all mechanics' liens and left the latter "practically worthless." It was clearly competent for a court of equity to decree that, upon failure of the association to comply with its obligatory contract for advances, if the contract was obligatory, the lien should be paramount to its deed of trust to the extent of those which were withheld. It was equally within the power of the court, if the advances were not obligatory, to hold the mechanics' liens superior to the trust, in so far as the payments made after notice of the liens had been given. This is the relief sought by the bill, and to which the property would have been subjected under the result arrived at by the learned justice below had not that property been released by the undertakings. It was clearly, and necessarily, competent for the court to enforce that liability against the parties to the undertakings, who had substituted themselves for the property in this respect.

Mr. Justice SHEPARD delivered the opinion of the Court:

There are several questions suggested by the facts in this case, as stated above, that, in view of the terms of the decree, do not necessarily require decision; but at the same

time, they enter more or less into the consideration of the principles upon which that decree must stand or fall, and will, therefore, be briefly considered.

1. The obligatory character of the contract of the Anglo-American Savings and Loan Association with David M. Lea to advance him the full sum of $46,500, to be paid in instalments at certain stages in the construction of his houses, and the record of the conveyance to its trustees to secure the same, before any contract by him let or entered into for the construction in any particular, gave that mortgage priority over all liens for labor and materials supplied to him under his subsequent contracts for construction. Compiled Stat. D. C., p. 367, Sec. 3; *Moroney's Appeal*, 24 Pa. St. 373; *Hoagland* v. *Lowe*, 39 Neb. 397, 407.

2. Nor is there anything in the arrangement between Lea and his vendors and the association, contemplating a scheme for the purchase of the property and the joint construction of the buildings thereon, that would justify the subordination of the mortgages of the former to the liens of the furnishers of labor and materials, in accordance with the doctrine of such cases as *Bohn Mfg. Co.* v. *Kountze*, 30 Neb. 719, 725, and *Henderson* v. *Connelly*, 123 Ill. 98. And that doctrine need not, therefore, be either approved or denied.

3. Although the loan was obtained for the express purpose of erecting the houses according to plans and specifications submitted with the application therefor, there is nothing in the nature of the contract, or in its terms, that made it obligatory upon the association to see that the money advanced thereunder was applied to payments for labor and material furnished in the construction. Hence, payments made to Lea, after, as well as before, notice of the claims due the appellees, and the filing of their liens, were in discharge of the contract of the association and brought it under no liability to them. *Moroney's Appeal*, 24 Pa. St.

373; *Rogers* v. *Central L. & T. Co.*, 49 Neb. 676; *Patrick Land Co.* v. *Leavenworth*, 42 Neb. 715.

4. The right to recover the amount of money retained by the association from the last instalment can not be enforced in favor of the mechanics' lien-holders by virtue of any declared trust, or one to be implied from the terms and conditions of its contracts alone. From the proposition that the association was under no obligation by virtue of its contract to see to the application of the money advanced, the conclusion necessarily follows, that from the mere promise, no matter how binding, to advance Lea the full sum of $46,500, no trust was impressed upon the part thereof retained by the association, in favor of the holders of the mechanics' liens any more than in favor of Lea's creditors generally.

It likewise follows that the promise made to Lea of the payment of the entire sum can not be enforced in equity, upon that ground alone, in favor of the appellees, under the doctrine enounced in *Keller* v. *Ashford*, 133 U. S. 610, 625, and explained again in *Constable* v. *National S. S. Co.*, 154 U. S. 51, 74.

In this last case it was said, following the Court of Appeals of New York, that, "to give a third party, who may derive a benefit from the performance of a promise, an action, there must be, first, an intent by the promisor to secure some benefit to the third party, and, second, some privity between the two, the promisor and the party to be benefited, and some obligation or duty owing from the promisor to the latter, which would give him a legal or equitable claim to the benefit of the promise, or an equivalent to him personally."

5. It now remains to inquire whether by reason of the special circumstances disclosed in the evidence, there is any other ground upon which the decree, enforcing the claim of the appellees against the $3,000 retained from the loan, can be upheld.

If there is, it must be by virtue of a constructive trust raised up by those special circumstances and conditions, consisting of representations and conduct upon one side, and of action founded thereon, upon the other, in accordance with established principles of equitable estoppel.

The special circumstances relied on to create the trust are summed up as follows for consideration:

It appears, with sufficient certainty, that the houses had been completed in compliance with the plans and specifications submitted with the application for the loan, and that they cost the sum of $46,500.

If the association had any defense upon either of those grounds, the facts were within its knowledge, and it was its duty to prove them. It had a supervisor, charged with the duty of seeing that the building was carried on according to the plans and specifications, and he had a watchman employed also. He was a witness, and testified that the buildings were completed December 9, 1896, and no question was asked him regarding the character of that completion, or the cost of the entire construction. The evidence shows that the appellees, particularly Campbell, looked to the fund to be advanced under the contract for the loan as a means of obtaining payment for their labor and materials.

. The written contract with Campbell shows the times of his payments corresponding with those of the advances to be made to Lea. They knew the details of the loan contract and say that they relied upon it as the basis of the credit extended to Lea. That they did so, and did not rely upon the individual capacity of Lea, or their right to a last lien upon the premises, is supported by every reasonable inference deducible from the surrounding circumstances. Lea was engaged in building upon land for which he had not paid, and that was under mortgages to secure at least two-thirds of the purchase money. The existence of these mortgages emphasized the incapacity of Lea to build without a pre-arranged loan, that was attested by the

contract with the association for the express purpose of building. It appears, moreover, that the loan could not be obtained without giving the mortgage for its security priority over the second purchase-money mortgage. It requires very little testimony, therefore, to produce the conclusion that, without confidence in the payment to Lea of the full amount of the loan contracted for, the appellees would not have extended him credit for their labor and materials. The reasonableness of such expectations on their part ought, naturally, to have suggested itself to the association. Engaged in the business of lending money to enable owners of city lots to improve, the association must have known, in the ordinary course of such transactions, that the consummated contract for the money to be advanced to Lea as the building progressed, under a mortgage taking priority over the statutory liens available to those contracting with him, would constitute a material inducement to them in supplying him with labor and materials. Charged with this knowledge it contracted to advance Lea the full sum of $46,500. It is true, as we have before said, that this contract with Lea did not bind the association to see that he actually applied the money, when advanced, to the payment of his contractors.

Payment into his hands was all that it was bound to make, and Lea's creditors had, therefore, no legal right to ask anything more. Had he received all of the money and then failed to pay them, they would have no remedy against the association, for its obligation would have been completely discharged.

Notwithstanding this, it appears, as if in express recognition of the reasonable expectations of Lea's contractors, that the practice in making payments was this: When the time for a payment arrived, a draft payable to Lea's order was sent by the association to its attorneys in Washington. Lea at once endorsed it to them and they collected the draft and disbursed the money. Claimants of money on account of

the buildings often notified them of the same, and they, in turn, notifying Lea's sureties, were sometimes directed to pay them, and did so.    All that remained was then delivered to the sureties on the bond given by Lea to indemnify the association; among other things, against mechanics' liens.    It was, of course, to their interest, as such sureties, to see that the money went to the contractors of Lea, and it would seem, from the failure of others to intervene in the suit, that the contractors were paid as long as the association continued to make the advances.

But when the time for the payment of the last instalment arrived, the association, for its own advantage and without justification shown in the conditions of the contract, or by the evidence in the cause, withheld the sum of $3,000, which, imputing common sense to Lea's sureties, and to him common honesty and an intention to fulfill his obligations to the appellees, would have been paid over to them.    If any presumption is to be indulged in respect of this it ought to be in favor of honesty and right doing.    Be that as it may, however, the association would be entitled to no benefit from any lack of certainty on that point if it acted wrongfully as to the appellees in retaining the money and giving Lea no opportunity to discharge his obligations with it.    *Angle* v. *Chicago, etc., Railroad Co.*, 151 U. S. 1, 12.

Conceding, as has been done, that there was no intention on the part of the association to create a trust in favor of Lea's contractors, by the terms of the contract, and granting that the contract made it no wrong, actionable on behalf of the appellees, to withhold the money, does not, in our opinion, answer the conditions presented by the special facts and circumstances stated above.

Equity will impress a trust contrary to the intention and will of a party where a fund has been obtained by him in violation of his duty to another.

In order to raise this duty as the foundation of a constructive trust there need be neither a promise for the bene-

fit of another, nor express fiduciary relations between them. It may be raised by representations, conduct, and the like, that have been relied upon by another under such circumstances as create an equitable estoppel upon one to pursue thereafter an opposite course for his own advantage. To create such an estoppel it is not always essential that some special representation be make to a particular person at the time. In this case the representation was made, in the first place, to all persons likely to come into contractual relations with Lea in the construction of his buildings; but when acted upon by one of them in good faith it became as if made personally to him. *Horne* v. *Cole*, 51 N. H. 287, 293.

That the representations in respect of the amount and purposes of the loan were not made to defraud anyone at the time, is apparent; but this is not essential. Nor is it necessary that the arrangement with Lea, who was in no condition to be specially concerned at the time, for the detention of a portion of the money, should have been made for the purpose of defrauding the appellees. *Horne* v. *Cole*, 51 N. H. 287, 292; 2 Pom. Eq., Sec. 803. Notwithstanding that the association was under no legal obligation to see that Lea paid the money, when advanced, to the appellees, it was under a moral obligation to them, at least, to pay over to him all that it had contracted to advance to enable him to pay for the construction of the houses.

Having, by its conduct, induced or contributed to induce the appellees to contract with Lea, and with their materials to increase the security for its own debt, it would be inequitable and unjust to permit the association to withhold the money upon which they relied for reimbursement.

The foundation of equitable estoppel is justice and good conscience. "Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed and been enforceable by other rules of the law, unless prevented by the estoppel; and its practical effect is, from motives of equity and fair dealing,

to create and vest opposing rights in the party who obtains the benefit of the estoppel." 2 Pom. Eq., Sec. 802.

Upon these equitable considerations, we conclude that the court did not err in decreeing the enforcement of a constructive trust in favor of the appellees upon the fund withheld from the loan to Lea.

The researches of counsel, likewise our own, have failed to discover a decision directly in point to guide us in reaching the conclusion at which we have arrived in this case; but we are none the less satisfied that its facts, though novel, bring it within the application of the well-established equitable principles that have been stated.

There is, however, a decision of the Supreme Court of the United States in an analogous case, within the governing principle of which, this case, in our opinion, is clearly included. See *Angle* v. *Chicago, etc., R.R. Co.*, 151 U. S. 1, 26.

In that case it appears that Angle had a contract with a railway corporation called the Portage Company, to construct a certain part of a railway that was to be completed to earn a grant of lands from the State of Wisconsin. The Portage Company arranged with a trust company for the advancement of the necessary money to complete the road, and Angle entered upon the performance of his contract with a large and sufficient force. He had no contract entitling him to a lien upon the Portage Company's land grant, but that formed the chief inducement of the credit that it had arranged for.

Whilst the work was being diligently prosecuted by Angle, the Chicago, St. Paul, Minneapolis and Omaha Railway Company (called the Omaha Company), by bribery of the Portage Company's officers secured the control of that company and forced the suspension of the work. Its conduct caused the trust company to withdraw its promised aid. The Omaha Company, then, by fraudulent representations, induced the legislature of the State to repeal the grant to the Portage Company and bestow the land upon it, in-

stead.  Angle recovered a judgment against the now insolvent Portage Company for the work done by him, and then filed his bill against the Omaha Company to subject the aforesaid land grant thereto.  His bill was dismissed, and that decree was, upon his appeal, reversed.

In the course of the opinion delivered by Mr. Justice Brewer for the majority of the court, it was said: "While no express trust attached to the title to these lands, either in the Portage or in the Omaha Company—while it may be conceded that when the legislature resumed the grant it took the title discharged of any express trust or liability in favor of the creditors of the Portage Company, and might have transferred an absolute title to any third party beyond the reach or pursuit of the Portage Company, or its creditors, yet it is still true that the lands were given to the Portage Company, as they had been given by Congress to the State in the first instance, for the purpose of aiding in the construction of the road; that a part of the work necessary for such construction had been done, and there is, therefore, an equity in securing, to the extent to which the work had been done, the application of these lands in payment thereof. And when the Omaha Company, by its wrongdoings, secured the full legal title to those lands, equity will hold that the party who has been deprived of payment for his work from the Portage Company, by reason of their having been taken away from it, shall be able to pursue those lands into the hands of the wrongdoer, and hold them for the payment of that claim which, but for the wrongdoings of the Omaha Company, would have been paid by the Portage Company, partially, at least, out of their proceeds.  While no express trust is affirmed as to the lands, yet it is familiar doctrine that a party who acquires title to property wrongfully may be adjudged a trustee *ex maleficio* in respect of that property. . . . The property was in the Portage Company for the purpose of aiding in the construction of this road; work was done by the plaintiff in that direction.  Equity

recognizes a right that that property should be applied in the payment for that work. The wrongdoing of the defendant, the Omaha Company, has wrested the title of this property from the Portage Company and transferred it to itself. It has become, therefore, a trustee *ex maleficio* in respect to the property."

That case is not distinguishable from this because of the element of actual fraud found to have been practiced by the party in whose possession the property was impressed with the trust. Actual fraud, intentional as regards the party seeking relief, is not essential to the raising up of a constructive trust any more than an equitable estoppel. If one makes an appropriation of a fund, which, if permitted to stand, would, by reason of the circumstances attending the transaction, work a wrong to another having an equity therein, and give him an unconscientious advantage over that other, the act will be regarded as what is called a constructive fraud in equity. 2 Pom. Eq., Secs. 1044, 1053.

6. There remain to be considered certain questions raised on the appeal of the sureties in the undertaking given under the permission of the statute to release the premises from the lien.

The property, as appears by stipulation made part of the record, was twice sold at public sale after the bill had been filed. The sale under the second deed of trust was made to one Mitchell. That under the association's deed of trust is recited as made to the "party secured thereby, for the sum of $45,300."

It seems, however, that the conveyance of the legal title under this sale was made to Harvey T. Winfield, who filed the undertaking aforesaid with M. I. Weller and Thomas H. Pickford as sureties, and procured orders, on November 25, 1897, releasing the premises from the operation of the liens sought to be established in this suit.

(1) The first contention on behalf of the sureties, is, that the undertaking is void, because Winfield, the principal

therein, was not a defendant in the proceeding and, there-
fore, not within the operation of the statute. The statute
provides: "That in all proceedings under this act the de-
fendant may file a written undertaking, with two or more
sureties, to be approved by the court, to the effect that he
and they will pay the judgment that may be recovered, and
costs, which judgment shall be rendered against all persons
so undertaking, and thereby release his property from the
lien hereby created. . . .

"If such undertaking be approved before the filing of the
aforesaid bill in equity to enforce said lien, the said sureties
shall be made parties thereto, and if, after the filing of said
bill, said sureties, upon the approval of said undertaking,
shall *ipso facto become parties* thereto, and in either case the
decree of the court shall run against them as well as the
principal on such undertaking." Compiled Stat. D. C., p.
368, Sec. 11.

That this undertaking may be entered into and substi-
tuted for the building *before* as well as *after* the filing of a
bill to enforce the mechanics' lien, is sufficient to indicate
that the word *defendant* was not used in its technical sense,
but with a meaning broad enough to cover the owner of the
premises in whom, at the time, the title may be vested. It
was intended as a means whereby the property might be
speedily unincumbered and rendered marketable, and this
was necessarily for the benefit of the owner at the time.
The ambiguity of the section of the statute as it now stands
under the act of 1884, recited above, grows out of the
broadening therein, by amendment, of the scope of Section
708 and others of the Revised Statutes of the District of
Columbia, the effect of which in permitting notices of the
liens claimed thereunder to be made out against the owner
of the property at the time the right to assert the lien ac-
crued instead of the owner at the time of the contract, was
declared in *Lefler* v. *Forsberg*, 1 App. D. C. 36, 40.

It follows that this ground of objection to the decree is

not well taken. That Winfield may have become the owner of the premises by purchase under the first mortgage, or in any other way, is immaterial; he is bound as owner by the recital of the undertaking and the release of the lien obtained thereon.

(2) The point of the second contention is well taken.

No decree for the payment of the money withheld by the association, and upon which a trust was impressed, should have been rendered against Winfield and his sureties, because there was no foreclosure of the mechanics' liens set up in the bill.

The decree impresses a trust, in favor of the appellees, upon the $3,000 retained by the association from the loan, and orders it paid over.

It is in the nature of the decree approved by this court in the case of *Emack* v. *Rushenberger*, 8 App. D. C. 249, 254.

The undertaking was not entered into to cover any liability of that character on the part of the association or of the former owner of the property. Its obligation is confined to the purpose of the statute.

Upon the failure to establish the mechanics' liens upon the premises, under the allegations and prayer of the bill, the obligation of the undertaking ceased, and it should have been so decreed.

For the reasons given, the decree will be modified so as to release the principal and sureties upon the undertaking, and in all other respects affirmed, with costs to the appellees.

The cause will be remanded to the court from whence it comes, with directions to modify and amend the decree in accordance with this decision. It is so ordered.

*Modified and affirmed.*